DAVID GOLUBOW,

                      Plaintiff                    **FINDINGS OF FACT & CONCLUSIONS OF LAW**

                                                          17-CV-467 (JMA)(AKT)

            -against-

LONG ISLAND RAILROAD,

                    Defendant.
----------------------------------------------------------------------X

**APPEARANCES:**

Christopher Dean
Kristen Sinnott
1225 Franklin Avenue, Suite 450
Garden City, NY 11530
    *Attorneys for Plaintiff David Golubow*

Paige Graves
Kevin McCaffrey
Law Department –1143
Jamaica Station
Jamaica, NY 11435
    *Attorneys for Defendant Long Island Railroad*

**AZRACK, United States District Judge:**

        Plaintiff David Golubow ("Plaintiff") brings this action against defendant Long Island Railroad ("Defendant") pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51. He seeks recovery for injuries he sustained on November 10, 2016 when he fell from a platform at the West Side Yard (the "WSY") while at work.

        On March 22 and 23, 2021, a virtual bench trial on liability took place before the undersigned. The Court has carefully reviewed the transcript of the trial, the trial exhibits, and the

parties' post-trial submissions and has considered these materials in light of its own recollections of the trial and its perception of the credibility of the witnesses who testified.

The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). As explained below, the Court finds that Plaintiff failed to satisfy his burden to prove by a preponderance of the evidence that Defendant was negligent.

## I. FINDINGS OF FACT

Plaintiff was hired by Defendant as an assistant conductor on March 28, 2001. (Tr.[1] 19-20.) Approximately two and a half years later, he was promoted to conductor—a position he held on the date of the incident. (Tr. 22.)

On November 10, 2016, Plaintiff was walking on a platform at the WSY. (Tr. 395.) The WSY is a non-public, train storage facility that contains thirty tracks. (Id.) At issue in this case is the platform that separates tracks 27 and 28. Situated on top of this platform is a utility closet that Defendant uses for storing heavy duty cleaning supplies. (Tr. 395-97.) The closet has two doors that close into themselves in a "French Door"-style. (Tr. 69.) Both doors are 77 inches high but differ in width, with the west door 26 inches wide and the east door 23 inches wide. (Tr. 254-55.) The original locking mechanism and handle were missing from the doors and replaced with a door hasp—a bar that goes across both doors to keep them in a closed position. (Tr. 262-64.) If one of these doors is opened, it will typically stay open in a fixed position unless some outside force is applied to it. (Tr. 309-10.)

Plaintiff's allegations concern the east door, which he alleged at trial was open and swinging at the time of the incident. When the east door is fully open, there is 33 inches of

---

[1] Citations to "Tr." refer to pages of the transcript of the bench trial held on March 22 and 23, 2021. (ECF Nos. 65-3, 65-4.)

clearance from the edge of the door to the platform. (Tr. 380.) When it is open at a 90-degree angle, there is a minimum of 23 inches of clearance from the door to the platform. (Tr. 310.) However, if the door is open wider, there is even more clearance between the door and the platform. (Tr. 321.)

Various witnesses, including Plaintiff, testified that before the November 10, 2016 incident, they were unaware of any safety concerns or complaints regarding the condition of the doors. (Tr. 59, 122-23, 147, 176, 227, 409.) In addition, no witness could recall any prior situations when an employee fell off the platform between tracks 27 and 28. (Id.) In fact, Plaintiff testified that over the course of his career, he walked past the utility closet on the platform "countless" times without any issue. (Id. at 34.)

Plaintiff testified that on the evening of November 10, 2016, he was on board a train that arrived in the WSY on track 28. (Tr. 60.) After he and a colleague performed a brake test while inside the train, Plaintiff exited the third west car and began walking on the platform in an eastward direction toward the opposite end of the train. (Tr. 64-65.) Although he had the option to walk inside the train as an alternative route, he chose to walk on the platform instead. (Tr. 67.) Plaintiff wore a two-strap backpack that contained his belongings, though he could not recall whether he was holding anything in his hands as he walked, such as a cellphone. (Tr. 65-68.) At the time, he had both work-issued and personal cellphones. (Tr. 67.) Though Plaintiff denied that he was checking messages on his cellphone while walking, he could not remember whether he was "looking at [his] phone at all." (Tr. 67.)

Plaintiff recalled that as he walked on the platform, the utility closet was on his left and the lighting conditions were adequate. (Tr. 68-69.) He testified that he noticed that the east closet door was moving "back and forth" from "east to west and west to east," while the west closet door

was closed. (Tr. 69, 72.) At trial, Plaintiff recounted that as he walked by the closet, he pushed the swinging door out of the way, though he could not recall the direction he pushed it. (Tr. 76.) He alleges that the door then swung back and hit his left shoulder, causing him to lose his balance and fall off the platform. (Tr. 76-78.) Plaintiff explained that he could "remember feeling the weight of [his] backpack pull [him] off balance." (Tr. 34.) Asked at trial if the "door knock[ed him] off the platform or just being startled," Plaintiff responded "[b]eing startled." (Tr. 77.)

When he fell, Plaintiff recalled that he landed on his left leg while his right leg hit a rail. (Tr. 35.) At approximately 11:00 p.m., two MTA police officers, Thomas Hughes and Anthony Merkerson, responded to the scene and saw Plaintiff on the track. Officer Hughes interviewed Plaintiff and then prepared an investigative report. His report stated: "[Plaintiff] stated he was walking on platform 27 on the West Side Yard when the door had swung open in front of him. In order to avoid getting hit by the door, he moved out of the way and fell on the track area." (Tr. 126; Ex. 1 at 731.) During cross-examination at trial, Officer Merkerson recalled that when he arrived at the scene, Plaintiff's coworker told him that Plaintiff had "slipped and fell from the platform." (Tr. 161.)

Thomas Sweeney, a transportation manager at Penn Station, also responded to the scene at approximately 11:00 p.m. He subsequently prepared a report that documented the incident. (Tr. 180.) Upon Mr. Sweeney's arrival, Plaintiff was on the tracks being treated by medical personnel. (Id.) Mr. Sweeney's report summarized his conversation with Plaintiff on the date of the incident as follows: "[Plaintiff] said that he was walking on the EIC platform between tracks 27 and 28 and he fell off the platform around the cleaning closet door that was open." (Tr. 183, Ex. A.) As Mr. Sweeney explained on direct examination, Plaintiff did not mention that the door was "swaying," just that "it was open." (Tr. 183.)

4

Shortly thereafter, Plaintiff was taken from the WSY to Bellevue Hospital, accompanied by Mr. Sweeney. (Tr. 82.) Contemporaneous medical records from Bellevue, dated November 11, 2016, note that Plaintiff reported to his medical provider, Dr. Rebecca Haberman, "that he works of LIRR and fell from the platform after he tripped." (Ex. S.)

Subsequently, Plaintiff met with Defendant's Medical Department. A report from his December 15, 2016 meeting with the Medical Department states that Plaintiff recounted to the medical examiner that he "mistepped and fell off platform." (Ex. T.)

On consent of the parties, the Court did not receive evidence regarding Plaintiff's damages, and the trial was limited solely to liability. At trial, several witnesses testified, including Plaintiff, his friend and colleague Joseph Aelby, Officers Hughes and Merkerson, Mr. Sweeney, Defendant's accident investigator Valerie Trichilo, and experts for each side, John Green and George Newman.

## II. CONCLUSIONS OF LAW

FELA provides that any railroad entity that engages in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ." 45 U.S.C. § 51. In an action under FELA, "a plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." Tufariello v. Long Island R. Co., 458 F.3d 80, 87 (2d Cir. 2006). Liability under FELA exists "if [the railroad's] negligence played a part—no matter how small—in bringing about the injury." CSX Transp., Inc. v. McBride, 564 U.S. 685, 705 (2011) (alteration in original). While "'[c]ourts apply a more relaxed standard of both negligence and causation to FELA negligence claims than to those arising under common law,' . . . FELA is not a strict liability statute and a railroad is not an insurer for its employees, so Plaintiff must submit some evidence

5

to support a finding of negligence." Curran v. Long Island R.R. Co., 161 F. Supp. 3d 253, 257 (S.D.N.Y. 2016) (quoting Coale v. Metro–N. Commuter R.R. Co., 621 Fed. App'x. 13, 14 (2d Cir. 2015)).

Plaintiff has failed to submit evidence to support a finding of negligence and therefore has not met his burden of proof. In particular, Plaintiff was the only witness to the incident in question, and his testimony regarding the events of November 10, 2016 is therefore critical to the Court's analysis. However, Plaintiff's trial testimony conflicts markedly with the contemporaneous records from the date of the incident and those shortly thereafter. Accordingly, the Court finds that Plaintiff's account at trial of the incident is not credible.

In a bench trial, "[a]ssessments of the credibility of the witnesses and the weight to be given to particular pieces of evidence are peculiarly within the province of the [district court] and are entitled to considerable deference." Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia), 134 F.3d 103, 104 (2d Cir. 1998). "The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact[.]" Chacko v. DynAir Servs., Inc., 272 F. App'x 111, 112 (2d Cir. 2008) (summary order) (internal quotation marks omitted). "[A]s trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012) (internal quotation marks and citations omitted).

Plaintiff's trial testimony—in which he recounted that the door hit him after he pushed it out of the way—conflicts with all of the contemporaneous documentary records from the date of the incident. The reports of Mr. Sweeney, Officer Hughes, and Dr. Haberman contain no indication that Plaintiff was hit by the door. Instead, all three of these reports detail how Plaintiff recounted that he fell from the platform without ever having been hit by the door. Approximately one month

later, Plaintiff again stated during an assessment by Defendant's Medical Department that he "misstepped and fell off platform." (Ex. T.)

When presented with this conflict between Plaintiff's trial testimony and the contemporaneous documentary record, the Court does not find Plaintiff's recounting of the incident at trial to be credible. Notably, his trial testimony lacked critical details. For example, Plaintiff could not definitively say whether he was looking at his cellphone while walking on the platform. In addition, his specific recounting of the incident during trial is implausible. For instance, it is unclear how, if Plaintiff had just pushed the door, it then startled him and caused him to fall from the platform. The record is also devoid of evidence beyond Plaintiff's testimony that supports his theory at trial—such as evidence of tests analyzing the door's ability to move independently or the impact of forces, like wind or a push, on the door's movement based on the door's weight. Plaintiff's conflicting stories of the accident as well as his lack of corroborating evidence cannot sustain his burden of proof to establish Defendant's liability. The Court therefore credits the most innocuous explanation of the accident: Plaintiff tripped and fell while walking on the platform around the open door, as he recounted immediately after the incident.

Alternatively, even if Plaintiff had not presented conflicting accounts of the incident, the Court would still find that he failed to sustain his burden to prove that Defendant was negligent with respect to the door. The parties agree that Defendant had a duty "to provide its employees with a safe workplace." Ulfik v. Metro-N. Commuter R.R., 77 F.3d 54, 58 (2d Cir. 1996). However, Plaintiff failed to meet his burden with respect to the remaining elements necessary to establish Defendant's negligence: breach, foreseeability, and causation.

Defendant breached its duty to Plaintiff if "it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its

employees." Id. As the Second Circuit has explained in the FELA context, "[t]he touchstone of this negligence inquiry is the issue of foreseeability—whether or not [the railroad] knew or should have known of the potential hazard." Id. There must be "proof of actual or constructive notice to the employer of the defective condition that caused the injury." Sinclair v. Long Island Railroad, 985 F.2d 74, 77 (2d Cir. 1993). Plaintiff has not demonstrated that the door was a hazard and therefore a breach of Defendant's duty to protect its employees. And even if the Court were to find that the door was a hazard, Plaintiff has failed to advance evidence that Defendant knew or should have known that the door was hazardous through either actual or constructive notice.

Plaintiff raises three arguments to support his contention that the door was a hazard: (1) an open door is in and of itself hazardous; (2) 23 inches between the door and the platform is too short of a distance and therefore hazardous; and (3) replacement of the door's locking mechanism and handle with a door hasp was hazardous. (ECF No. 66 at 4-6.) Each argument fails.

First, if an open door is "in and of itself" hazardous, as Plaintiff claims, it is difficult to conceive of how Defendant could utilize any door in its operations without being negligent. The basic function of a door is its ability to open and close, which appears to be incompatible with Plaintiff's contention that Defendant "had a duty to make sure that the door was secured closed every single time it was used." (Id. at 4.) As part of this argument, Plaintiff also claims that Defendant's failure to secure the door so that it would not open constituted a hazard. However, Plaintiff's logic would suggest that anytime someone is in the process of accessing the utility closet a similar "hazardous" situation is created. Indeed, all doors seemingly operate in this manner. The fact that a door opens and can move while it is open is not per se a hazard, and Plaintiff advances no basis for the Court to find otherwise.

8

Plaintiff next argues that the 23 inches between the door and the platform when the door is at a 90-degree angle is too short of a clearance and therefore hazardous. As support, Plaintiff cites the testimony of Defendant's expert, George Robert Newman, for the proposition that "anything less than twenty-five inches in that area [where the doors opened in front of the closet] would be unsafe." (Id. at 4.) However, the cited testimony does not support Plaintiff's contention. At trial, Mr. Newman was presented with his prior deposition testimony in which he was asked:

> QUESTION: If there was a design when the door was open and there was 25 inches from the door edge to the platform, would you recommend that design?
>
> ANSWER: 25 is approaching where it could be unsafe.
>
> QUESTION: Anything less than 25 you wouldn't recommend that design?
>
> ANSWER: In that area.

(Tr. 387.) Plaintiff's argument ignores Mr. Newman's further testimony offered shortly thereafter at the trial in which he was asked: "So, can we agree that if you have a pathway or walkway like you said less than 25 inches in this area, you would not recommend that design because it's unsafe; isn't that true?" Mr. Newman responded: "23 [inches], 24, 25, I'm okay with." (Tr. 389.) In other words, Mr. Newman testified that he was "okay with" a 23-inch clearance, contrary to Plaintiff's assertion.

Plaintiff's reliance on his own expert's testimony is similarly unpersuasive to support his contention that a 23-inch clearance between the door and platform is a hazard. At trial, Plaintiff's expert, John Green II, opined that a 23-inch clearance between a pole or scaffolding and a platform would not be OSHA compliant. (Tr. 319.) Mr. Green cited no OSHA standards in his testimony and did not provide any explanation as to which specific OSHA guidelines Defendant violated and how. In addition, for purposes of the negligence analysis, Plaintiff points to no authority that holds that a violation of OSHA standards is per se a hazard for purposes of performing a FELA

9

negligence analysis. Nor could he because, as the Second Circuit has explained, "OSHA is simply evidence of the standard of care, the violation of which may be accepted or rejected as proof of negligence by the trier of fact according to the sum total of all the evidence." Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 595 (2d Cir. 1998). As the trier of fact, the Court rejects Plaintiff's argument based on Mr. Green's testimony that because the clearance violated OSHA, it proves Defendant was negligent. Additionally, with respect to the length of the clearance, the lay witness testimony Plaintiff cites from an MTA officer who visited the incident scene and then opined at trial that a 23-inch clearance would not be "enough space," (Tr. 163), likewise does not establish that the clearance was a hazard. The testifying officer, Officer Merkerson, had no specific expertise that would allow him to determine what a reasonable clearance length is. His response to a question on cross-examination appeared to be nothing more than speculation and has no bearing in the Court's assessment as to whether the clearance was a hazard. Finally, Plaintiff advances no evidence regarding the size and width of an average person for the Court to credit his theory that the clearance was too narrow.

Plaintiff's last argument—that it was hazardous for Defendant to alter the door's latching mechanism and replace it with a bar and hasp—also fails. Plaintiff argues that in removing the latching mechanism and replacing it with the bar and hasp, Defendant made it more difficult to secure the door because replacing the bar and securing the hasp required more work than simply latching the door into a closed position. (ECF No. 66 at 6.) However, the Court is unaware of any evidence—and Plaintiff cites none—that the reason the door was purportedly swinging at the time Plaintiff encountered it was because the bar and hasp did not work properly. Nor does Plaintiff identify any evidence that a bar and hasp is less safe than a latch. Rather, the prior user of the door could have failed to close it properly—a situation that could have also happened had the original

latching mechanism still been in place. Indeed, on the very next page of his brief, Plaintiff acknowledges this alternative explanation, arguing that "[i]t was absurd for the railroad to assume that every time someone opened the door that they would put the bar up and reattach the hasp." (Id. 7-8.) Therefore, nothing in the record indicates that the bar and hasp replacements were hazardous in and of themselves.

Plaintiff's generalized arguments regarding the door at issue being a hazard could be applied to seemingly any door. The fact that the door swung does not make it a hazard. Nor does Plaintiff point to any other unique features of the specific door that make it more hazardous than any other door Defendant uses throughout its train system. The Court finds no basis to credit Plaintiff's argument that "a door stop … a lock on the door, or . . . warning signs" were necessary given the seeming ubiquity of doors in American life and throughout Defendant's transportation system, with which Plaintiff was intimately familiar given his many years of work experience. (Id. at 8.) Indeed, Plaintiff testified that he walked past the specific door at issue countless times without any issue. No instruction manual for walking past a door was necessary and it is unclear why Plaintiff could not have been "startled" by seemingly any comparable door that was swinging at a time he did not expect it. To borrow an apt analogy from Defendant's papers, "Would [Defendant] be liable if plaintiff tripped over his shoelaces on his company issued shoes because [Defendant] did not train him how to tie them?" (ECF No. 65 at 31.) Such a concept is supported by the case law, too, as "FELA does not obligate [a railroad] to eliminate all workplace difficulties, maximize convenience for its employees, or use particular methods to discharge its duty to maintain a reasonably safe work environment." McWatt v. Port Auth. Trans-Hudson Corp., No. 13-CV-4421, 2015 WL 12559894, at *5 (S.D.N.Y. Mar. 20, 2015).

Also undermining Plaintiff's argument that the door was a hazard is that the record lacks any evidence that would put Defendant on actual or constructive notice that the door could cause injury. At least six witnesses employed by Defendant, including Plaintiff himself, testified that they were unaware of any issues with the condition or safety of the door before the incident on November 10, 2016. (Tr. 59, 122-23, 147, 176, 227, 409.) In addition, no witness could recall any prior incidents in which an employee fell off the platform between tracks 27 and 28. (Id.) Because Defendant had "no reasonable ground to anticipate that a particular condition . . . would or might result in a mishap or injury, then the party is not required to do anything to correct the condition." CSX Transp., 564 U.S. at 703. The Court, therefore, does not find that the incident involving Plaintiff was foreseeable.

Though it is not necessary for the Court to perform this analysis, as the Court previously found that Plaintiff's trial testimony was not credible, Plaintiff's failure to meet his burden on these points is also fatal to his case, as he has failed to prove negligence, which is necessary to establish liability under FELA. Because Plaintiff has not provided facts that establish Defendant breached its duty or that his injuries were a reasonably foreseeable consequence of any alleged breach, there is no evidence to find that Defendant was negligent.

### III. CONCLUSION

For the reasons set forth above, the Court directs the Clerk of Court to enter judgment accordingly in favor of Defendant and close this case.

**SO ORDERED.**

Dated: July 7, 2021
     Central Islip, New York

                                          /s/ (JMA)
                                          JOAN M. AZRACK
                                          UNITED STATES DISTRICT JUDGE